Estate of James O. Miles, Deceased, Esmie E. Miles, Administratrix, and Annie B. Miles v. Commissioner.
Estate of Miles v. Commissioner
Docket No. 31892.
United States Tax Court
T.C. Memo 1955-75; 1955 Tax Ct. Memo LEXIS 262; 14 T.C.M. (CCH) 237; T.C.M. (RIA) 55075; March 31, 1955
*262 In 1949, during an investigation of petitioners' income tax liability, the respondent's agents were shown by petitioners the contents of their safe-deposit box, an accumulation of currency in small denominations in excess of $25,000. Some of the currency was in envelopes bearing dates back to 1942. James Miles was a physician, and with his wife, he owned rental properties. During 1942-1948, petitioners spent or handled over $20,000. Although they reported gross income in returns for 1942-1948 of over $61,000, they reported net income of around only $16,000, and tax of only $573.22. Because records of income were either not available or incomplete, respondent resorted to the net worth method of computing petitioners' taxable income for the years 1942-1948. He did not allow any amount for cash on hand at the beginning of the net worth period. He determined that petitioners' annual taxable income was greater than reported and added 50 per cent penalties for fraud to the deficiencies. Upon the entire record it is held: (1) That respondent was justified in resorting to the net worth method in determining taxable income. (2) That he erred in not allowing some amount for pre-1942 undeposited *263 cash savings. (3) The petitioners had at the beginning of the net worth period undeposited savings in an amount found from the entire record but less than petitioners claim. (4) That the petitioners used a large part of their pre-1942 savings during 1942-1948. (5) That the entire record supports the finding that petitioners accumulated most of the undeposited cash in the safe-deposit box during 1942-1948. (6) That petitioners understated their taxable net income in their returns for 1942-1948 in substantial amounts but that such understatements were less than respondent determined. (7) That false or fraudulent returns were filed for the years 1942-1946, and that deficiencies are not barred for those years. (8) That at least part of the deficiency for each year was due to fraud with intent to evade tax. Walter H. Maloney, Esq., for the petitioners. George C. Lea, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner originally determined the following deficiencies in income tax for the years 1942 through 1948, to which he added 50 per cent fraud penalties under section 293(b) of the 1939 Code: Year
Deficiency
50% Addition
1942
$ 1,561.06
$ 780.53
1943
1,682.87
841.44
1944
5,165.85
2,582.93
1945
1,669.57
834.79
1946
1,439.49
719.75
1947
2,330.86
1,165.43
1948
2,893.08
1,446.54
Total
$16,742.78
$8,371.41
*264 The deficiencies were determined by the net worth and expenditures method. The parties have agreed upon the amounts of the annual expenditures and all of the assets and liabilities in a revised net worth statement on the basis of which the respondent now claims deficiencies and penalties in lesser amounts than he originally determined. The Commissioner, in his original and revised net worth statements, did not include in assets at the beginning of the net worth period, any amount for undeposited cash on hand. The petitioners had undeposited cash on hand at the end of 1948. The Commissioner, in his net worth statements, included equal proportionate amounts thereof in assets as of the end of the years 1942-1948, cumulatively. The issues concern the propriety of using the net worth method of computing the taxable income of the petitioners; the amount of undeposited cash on hand, if any, at the beginning of the net worth period; the amount of undeposited cash on hand at the end of each of the years 1942-1948, inclusive; whether there was understatement of taxable income for any of the years 1942-1948, inclusive, the correctness of the Commissioner's determination of fraud; and the *265 statute of limitations. Findings of Fact Joint returns were filed timely, by James and Annie Miles for each of the years 1942-1948, inclusive, with the collector for the district of Maryland, at Baltimore. The statutory notice of deficiency was mailed on September 27, 1950. James Miles died in the District of Columbia, after the trial of this proceeding, on June 14, 1953. Esmie E. Miles, his daughter, is the administratrix of his estate, and has been substituted as a petitioner, but, for convenience, James Miles is sometimes referred to herein as a petitioner. Annie Miles is the widow of James. James and Annie were married in 1925, in Panama. They had two children who are living. One was born in 1929, the other, in 1930. James and Annie are sometimes referred to hereinafter as the petitioners. James and Annie Miles resided continuously in the District of Columbia since 1925. James Miles was a physician. He received a license to practice medicine in Maryland in 1933, and in the District of Columbia in 1935. He opened an office in Rockville, Maryland, in 1933, where he practiced until June 1940. He opened another office in Washington, D.C., in about 1936. He carried on *266 his practice in Rockville and the District until June 1940 when he discontinued his practice in Rockville. From June 1940 until his death, James practiced medicine in Washington, D.C. His office was located at 2500 Ontario Road, N.W., in a house which he and his wife purchased in 1940. Annie Miles worked in Washington, D.C., as a cook during 1926, 1927, 1928, and in 1929, until her first child was born. Thereafter, she was not employed and stayed at home. She did laundry work at home for others from time to time. After she and her husband acquired properties, she looked after the renting and management of the properties and the collection of rents. James and Annie were both born in 1898 in Jamaica, British West Indies. Although they were unacquainted in Jamaica, each went to Panama in 1914, and each resided there continuously, in either the Panama Canal Zone or the Republic of Panama, until sometime in 1925 when they both came to the United States. Each was employed while living in Panama. While he lived in Panama, James was employed by the Panama Canal Commission in the Canal Zone during the day. At night he studied the subject of drugs and compounding drugs under a druggist *267 who owned a drug store. After he was qualified, he worked at night in the drug store under a registered druggist. For several years he worked day and night at two jobs. In 1924, he resigned from his employment by the Canal Commission and took another job in the Canal Zone public school system which he held until he departed to the United States. James wanted to study medicine. He applied for admission to Howard University in Washington, D.C. During the years he worked in Panama he saved money in preparation for studying to become a physician. Before he came to the United States he was accepted by Howard University in Washington, D.C. He brought some savings into the United States in 1925. He did not keep any record of these savings or of the disposition thereof. While she lived in Panama, Annie was employed almost continuously as either a maid, or waitress, or cook in the Canal Zone. She usually lived with the family for whom she worked. She saved some of her earnings. She also bought tickets in the legal Panama lottery and sometimes won money from the lottery. She brought some savings into the United States in 1925. She did not keep any record of these savings or of the disposition *268 thereof. James entered Howard University in Washington, D.C. in 1925, from which he received a degree in medicine in 1932. He then served his internship. He had partime employment while he was a student and intern. On July 1, 1932, the petitioners purchased a house on 11th Street, N.W. in Washington, for their residence. They took title as tenants by the entirety. The price of the property was $5,500. A down payment of $700 was made. A deed of trust was given to secure the balance of $4,800 which was payable over 3 years at $40 per month. Annie provided the down payment out of her savings. This property was fully paid for before 1941. Prior to December 31, 1941, James purchased a blood pressure gauge for $32.50 (1933), a sterilizer for $50 (1936), a diathermy machine for $360 (1936), and an automobile for $1,250 (1940). All of these items were fully paid for before the end of 1941. In 1938, the petitioners opened a joint savings account in the Riggs National Bank in Washington. As of December 31, 1941, the balance in the account was $1,057.12. In 1940, the petitioners opened a joint checking account in the Riggs National Bank. At the end of 1941, the balance in the account *269 was $350.68. In February 1940, petitioners purchased a house containing 7 rooms located at 2500 Ontario Road, N.W. in Washington. Title was taken as tenants by the entirety. The price of the property was $9,500. A down payment of $1,500 was made, and a deed of trust for $8,000 was given to secure the balance. By the end of 1941, trust payments totaling $1,536.03 had been made reducing the trust to $6,463.97. On September 11, 1941, the petitioners purchased a house containing 7 rooms at 1859 California Street, N.W. Title was taken as tenants by the entirety. The price was, $8,750. A down payment of about $1,800 was made, and a deed of trust was given to secure the balance of $6,950. Additional payments of $1,099.28 were made which reduced the balance of the trust to $5,850.72 as of the end of 1941. At the end of 1941, James and Annie owned United States savings bonds for which they paid $750. During years before January 1, 1942, James and Annie made cash payments for real estate, bonds, automobile, and equipment in the total amount of $13,877.81: 3221 11th St., (1932)
$ 5,500.00
2500 Ontario Rd. (1940)
3,036.03
1859 California St. (1941)
2,899.28
Automobile (1940)
1,250.00
U.S. Savings Bonds
750.00
Diathermy Machine (1936)
360.00
Sterilizer (1936)
50.00
Blood Pressure Gauge
32.50
$13,877.81
*270 At the end of 1941, James and Annie had $1,407.80 in bank accounts. Petitioners did not file income tax returns for any year prior to 1942. They did not keep any record of savings or gifts accumulated during the period 1925-1941, inclusive, or of disbursements from any such accumulations. No records are available of their earnings and expenses during that period. Petitioners did not have any safetydeposit box until May 25, 1949, when they rented a box at the Riggs National Bank and placed in the box many packages of currency. Prior to renting a lock box, petitioners kept undeposited money in their own possession. There are no available records of Dr. Miles' receipts from his medical practice for 1942, 1943, 1944, and 1945; and there are no available records of his expenses. He retained diaries for 1946, 1947, and 1948 in which he noted fees received from patients. Such record was not totalled for each year, and complete records were not kept of expenses. Addresses of patients were not listed in the diaries so that fees noted in the diaries could not be verified. Additions were made of the fees listed in the diaries for the purpose of the trial of this proceeding which showed *271 the following gross receipts from medical practice: Year
Fees Listed in Diaries
1946
$3,874.25
1947
3,736.55
1948
3,543.00 The amounts of fees listed in the diaries were from $1 to $50, and occasionally, $100. A few cancelled checks were retained which showed expenses of the medical practice for 1945, 1946, 1947, and 1948. The total amount of expenses for each year, as shown by such checks, is greatly less than the amount of such expense which was deducted in the return for each of these years. No accounting records were kept for any of the years involved of rents received and of the expenses of operation and of repairs of the rental properties. A few cancelled checks were retained which showed payments in 1945-1948, inclusive, for expenses of operating the properties, but the total amount of checks for each year is greatly less than total amount deducted in the return for each year. No regular set of books, or a complete but informal set of books to show all of the income and all of the expenses, was kept by petitioners for any of the taxable years. Petitioners' records of income and expenses were either lost, or were incomplete. It was impossible for the *272 Commissioner's agents to verify all of the items in the returns of petitioners for the years 1942-1948, inclusive. The petitioners reported in their joint returns for 1942-1948, inclusive, net income; surtax net income after personal exemptions, credits for dependents, and earned income credit; and income tax due as follows: Surtax
Income
Year
Net Income
Net Income
Tax
1942
$ 2,128.83
$ 228.83
$ 30.71
1943
2,155.22
39.70
60.96
1944
2,246.74
246.74
88.97
1945
1,538.59
29.45
1946
3,568.30
1,568.30
297.98
1947
2,342.91
342.91
65.15
1948
2,117.68
Total
$16,098.27
$2,426.48
$ 573.22
For each of the years involved, petitioners reported income from three sources, namely, medical practice, rental properties, and interest. Deductions were taken for expenses of the medical practice, expenses of operating rental properties and of repairs, plus depreciation, and for miscellaneous items. Total receipts, total deductions, and reported net income per income tax returns, were as follows.. Total
Total
Net
Year
Receipts
Deductions
Income
1942
$ 6,171.59
$ 4,042.76
$ 2,128.83
1943
6,504.02
4,348.80
2,155.22
1944
7,212.63
4,965.89
2,246.74
1945
8,554.19
7,015.60
1,538.59
1946
10,337.00
6,768.70
3,568.30
1947
10,497.67
8,154.76
2,342.91
1948
11,863.62
9,745.94
2,117.68
Totals
$61,140.72
$45,042.45
$16,098.27
*273 The amounts of gross receipts from medical practice, and the expenses thereof plus automobile expense deductions were stated to be as follows, in the income tax returns of petitioners: Gross
Receipts,
Net
Year
Medical
Expenses
Receipts
1942
$ 3,028.00
$ 1,230.74
$ 1,797.26
1943
3,346.25
1,363.35
1,982.90
1944
3,500.75
1,297.29
2,203.46
1945
3,650.00
1,391.38
2,258.62
1946
$ 3,600.00
$ 1,563.04
$ 2,037.96
1947
3,637.00
2,043.01
1,593.99
1948
3,697.96
2,111.30
1,586.66
Total
$24,459.96
$11,000.11
$13,460.85
The amounts of gross receipts from rents, and the total amounts of the deductions for repairs, operations (exclusive of taxes), and depreciation were stated to be as follows in the income tax returns of the petitioners: Expenses, Depre-
Net
Year
Rents
ciation, Etc.
Receipts
1942
$ 3,123.00
$ 2,115.46
$ 1,007.54
1943
3,145.65
2,304.09
841.56
1944
3,700.50
2,848.06
852.44
1945
4,870.00
4,756.10
113.90
1946
6,700.00
4,248.00
2,452.00
1947
6,816.00
5,071.34
1,744.66
1948
8,114.00
6,281.95
1,832.05
Total
$36,469.15
$27,625.00
$ 8,844.15
In their returns, *274 petitioners reported "other" income, and they took "other" deductions (including deductions for real estate taxes) as follows: Other
Other
Year
Income
Deductions
1942
$ 20.59
$ 696.56
1943
12.12
681.36
1944
11.38
820.54
1945
34.19
868.12
1946
36.50
957.66
1947
44.67
1,040.41
1948
51.66
1,352.69
Total
$211.11
$6,417.34
In the summer of 1949, Annie and her daughter prepared to take a trip to Panama where Annie's sister lived. In connection with obtaining their passports, Annie was questioned about the possibility of any liability for unpaid Federal income taxes. She was asked to deposit $250 with agents of the Commissioner to cover any possible tax deficiencies, and was advised that an audit would be made of her income tax returns. Annie and her daughter went to Panama; they returned to Washington in the fall of 1949. In the fall of 1949, the Commissioner's agents started an investigation of the sources of the petitioners' income, in the course of which, James told the agents that he had a safety-deposit box containing an accumulation of currency. On October 14, 1949, the box was opened by the agents who found that it contained two *275 United States savings bonds in the face amount of $1,000, each, bearing the purchase date of February 17, 1947, and United States currency in the total amount of $25,251. There were 67 separate packages of currency in the box in denominations of one-, two-, five-, ten-, and twenty-dollar bills, and there was one fifty-dollar bill. There were about 4,074 pieces of currency. There were more than 1,100 one-dollar bills, 1,205 five-dollar bills, 1,210 ten-dollar bills, and 250 twenty-dollar bills. Most of the wrappers in which bundles of currency were secured did not bear any dates. There were 47 packages of envelopes which did not bear any dates which contained the total sum of $17,556. Of these, 8 envelopes or packages contained $1,000, each, or more, aggregating $8,701; and 39 packages contained $100, or $200, or $300, up to $985, aggregating $8,855. There were 20 envelopes containing currency which bore postmarked dates of the years 1942-1949, except 1945, which contained the total amount of $7,695. One envelope bearing a 1944 date contained currency in the amount of $1,000; two envelopes bearing 1948 dates contained $1,000, each. The other dated envelopes contained currency in *276 various total amounts ranging from $100 to $995. The total amounts contained in dated envelopes were as follows: Dated Envelopes
Total Amounts
1942 (2)
$ 200
1943 (1)
200
1944 (4)
2,295
1946 (3)
700
1947 (3)
1,000
1948 (5)
2,700
1949 (2)
600
Total
$7,695
Many of the envelopes were marked in ink or pencil handwriting with amounts such as "two hundred," "three hundred," or "six hundred." A few envelopes were marked with a series of arabic figures in increasingly larger amounts, all of the lower amounts being crossed out except the last and highest amount. On such envelopes the highest amount noted was $1,000, or close to that sum. Annie told the agents that $17,000 of the cash in the lock box belonged to her, and that it represented a gift she had received in Jamaica from her father and brought into the United States. James told the agents that part of the cash belonged to him and that he had received it in Jamaica from his father and brought it into the United States. The Commissioner's agents were unwilling to accept the petitioners' explanations of the sources of the accumulation of cash in the lock box. The petitioners did not have any records *277 of their savings or any documentary evidence of their receipts of the alleged gifts from their respective fathers. They did not have complete and adequate books of account or records of their receipts of income and their disbursements for expenses for the period 1942-1948. The Commissioner's agents were unable to verify all of the items of income and deductions reported in the returns of the petitioners for 1942-1948. Because of this situation, the accumulation of cash in the lock box, the respondent determined the taxable net income of the petitioners for the years 1942-1948 by use of the increase in net worth and expenditures method. Because there were envelopes in the lock box bearing postmark dates of the year 1942, the Commissioner's net worth statement covered the year 1942, and successive years, and began with net worth at December 31, 1941. In his net worth statement, the respondent did not allow the petitioners any amount, as of December 31, 1941, for undeposited savings. He regarded $600, out of the $25,251 in the lock box as savings of the year 1949, because such amount was contained in 2 envelopes bearing 1949 dates. He determined, therefore, that the petitioners had *278 savings on hand at the end of 1948 in the amount of $24,651. He determined that this amount represented savings accumulated during the period 1942-1948, and be allocated this amount equally over the 7 years, $3,521.57 to each year, cumulatively, so that in his net worth statement the total amount of undeposited savings at the end of 1948 amounted to $24,651. The Commissioner, in his revised net worth statement, determined that the net worth of the petitioners as of December 31, 1941, amounted to $14,062.54, as follows: ASSETS
Savings in Bank
$ 1,057.12
Checking Account
350.68
U.S. Bonds
750.00
11th St., R.E. - '32
5,500.00
Ontario Rd., R.E. - '40
9,500.00
California St., R.E. - '41
8,750.00
Buick - '40
1,250.00
Diathermy - '36
$ 360.00
Sterilizer - '36
50.00
B-P Gauge - '33
32.50
Total
$27,600.30
LIABILITIES
Trust, Ontario Rd.
$ 6,463.97
Depre., Ontario Rd.
388.28
Trust, California St.
5,850.72
Depre., California St.
81.66
Depre., Buick
500.00
Depre., Diathermy
198.00
Depre., Sterilizer
27.50
Depre., B-P Gauge
27.63
Total
$13,537.76
NET WORTH
$14,062.54
The respondent's revised net worth statement (Exhibit N) is incorporated *279 herein by this reference. The respondent's revised net worth statement showed that the petitioners' net worth, before expenditures for living expenses and taxes, increased in each of the years 1942-1948 in the following amounts: Increase in
Year
Net Worth
1942
$ 5,277.64
1943
4,369.86
1944
12,324.41
1945
3,017.94
1946
4,331.97
1947
5,989.66
1948
11,067.03
The parties have agreed upon the amounts of the annual allowances for depreciation of petitioners' depreciable property. The agreed amounts are larger than the amounts which were deducted for depreciation by petitioners in their returns. The parties have agreed, also, that a reasonable estimate of expenditures for the living expenses of the petitioners is $2,300 for each of the years 1942-1948. Effect has been given by the respondent to these stipulations in his revised net worth statement. The expenditures of the petitioners for living costs and taxes, which are included in respondent's revised net worth statement, and are not in dispute, are as follows: Living Expenses
and Income Tax
Year
Payments
1942
$2,300.00
1943
2,368.55
1944
2,368.12
1945
2,409.82
1946
2,300.00
1947
2,732.49
1948
2,300.00
*280 The respondent determined in his revised net worth statement that the correct net income and the unreported net income of petitioners for each of the years 1942-1948, were as follows: Corrected
Unreported
Net Income
Net Income
Year
Revised
Revised
1942
$ 7,577.64
$ 5,448.81
1943
6,738.42
4,583.20
1944
14,692.53
12,445.79
1945
5,427.76
3,889.17
1946
6,631.97
3,063.67
1947
8,722.15
6,379.24
1948
13,367.03
11,249.35
$63,157.50
$47,059.23 The use of cash by petitioners during the years 1942-1948, inclusive, is indicated by the following: In 1942, petitioners paid $450 for United States Savings bonds, and $1,939.04 on trusts on real estate, of which $1,000 was to reduce a trust. In 1943, petitioners $225paid for savings bonds, and $1,496.75 on trusts on real estate. In 1944, petitioners paid $75 for savings bonds. They deposited $4,000 in their joint savings account. They purchased a house at 1370 Kenyon Street at a price of $12,500, on which they made a down payment of $5,000. They paid $1,495.97 on trusts on other real estate. In 1945, no savings bonds were purchased. Petitioners paid $1,325.14 on trusts on real estate. *281 In 1946, no savings bonds were purchased. Petitioners paid $1,762 on trusts on real estate. In 1947, petitioners paid $1,500 for savings bonds. They paid $1,705.37 on trusts on real estate. In 1948, no savings bonds were purchased. The petitioners bought a house at 1368 Kenyon Street at a price of $18,000, on which they made a down payment of $8,000. They paid $1,351.85 on trusts on other real estate. The petitioners bought furniture (probably second hand) for the houses on Ontario Road, California Street, and Kenyon Street, but there are no records available of the amounts spent in each year for furniture and furnishings. On October 19, 1945, petitioners borrowed about $1.500 to make improvements on the house at 1370 Kenyon Street. In order to obtain a permit to rent the property, petitioners had to fireproof the basement and install fire escapes. They borrowed the above sum from the company which held the trust on the property, increasing the amount of the trust. Petitioners' total, annual disbursements of cash in each of the years 1942-1948, inclusive, for bonds, real estate, estimated living expenses, and income taxes, including the deposit of $4,000, in 1944, in their *282 savings account were at least as follows (cents omitted): 1942
1943
1944
1945
1946
1947
1948
Savings bonds
$ 450
$ 225
$ 75
0
0
$1,500
0
Real estate
1,939
1,496
6,496
$1,325
$1,762
1,705
9,352
Living expenses
2,300
2,300
2,300
2,300
2,300
2,300
2,300
Income tax
0
68
68
110
0
432
0
Saving account
0
0
4,000
0
$4,689
$4,089
$12,939
$3,735
$4,062
$5,937
$11,652
The total of the balances in petitioners' checking and savings accounts at the end of each of the years 1941-1948, inclusive, were as follows: Total of Bank
Balances as of
Year
December 31
1941
$1,407.80
1942
1,597.47
1943
1,545.03
1944
4,721.79
1945
4,922.84
1946
4,785.63
1947
4,842.24
1948
3,981.39
The balances due on the trusts on petitioners' real estate at the end of the years 1941-1948, inclusive, were as follows: 1370
1368
Ontario
Kenyon
Kenyon
Year
Rd.
Calif. St.
St.
St.
1941
$6,463
$5,850
1942
4,944
5,431
1943
3,842
5,036
1944
2,861
4,616
$,405
1945
1,980
4,193
8,578
1946
1,038
3,730
8,222
1947
164
3,242
7,878
1948
2,447
7,520
$9,801
*283 The Ontario Road and California Street properties were devoted to the rental of furnished rooms throughout the 7 taxable years. The Ontario Road building contains 7 rooms. The O.P.A. maximum rental rates for these rooms were $7.50 per week for 3 rooms; $8.50 per week for 3 other rooms; and $32.50 for 1 other room. There are 7 rooms in the California Street property. The O.P.A. maximum rental rates for these rooms during the taxable years were $7.50 per week for 2 rooms; $8 per week for 1 room; and $6.50 per week for 4 rooms. The petitioners furnished these 2 houses for rental. The property at 1370 Kenyon Street needed repairs when it was acquired. It contains four apartments on the upper floors, and a basement apartment. Petitioners could not rent any space in this building until November 1945. They furnished the apartments. Rents were received from this property during 3 years and 2 months of the 7-year period involved in this proceeding. The maximum O.P.A. rates applicable to this building were, per month, $60 for the fourth floor apartment; $90 per month for the third and second floor apartments; $75 per month for the first floor apartment; and $45 per month for the basement *284 apartment. There are 3 rental units in the premises at 1368 Kenyon Street. Petitioners received rents from this property for 2 months in 1948. The units were rented furnished. The maximum O.P.A. rental rates applicable to these units were $40, $56, and $60, respectively. Light, heat, water, and janitor service was provided by petitioners in each of their properties. The petitioners are of the colored race. The patients of Dr. Miles and the tenants in the petitioners' rental properties were of the same race. Dr. Miles was not inducted into the armed service during the war. He received a "Selective Service Award" for services from June 28, 1941 until March 31, 1947, as an examining physician for the selective service system, and a medal from the President of the United States for his services as an examining physician. He did not receive payment for some of his services for the Selective Service System. With respect to the accumulation of undeposited cash, Dr. Miles put money in some of the envelopes over a period of time, from time to time. When he put money in an envelope, he noted on the envelope in figures the new total amount of the contents and crossed out the old total *285 amount. At various times, money was taken out of the envelopes. Some of the money placed in envelopes came from rents and professional fees. No records were kept of the sources of any of the money placed in envelopes. Petitioners expended for Federal income taxes, estimated living expenses ($2,300), savings bonds, and mortgage payments in each of the years 1942-1948, inclusive, more than they reported as their net income for each year, as the following schedule shows: 1942
1943
1944
1945
Cash paid out
$4,689
$4,089
$3,939
$3,735
Net income per re-
turn
2,128
2,155
2,246
1,538
Excess (approxi-
mate) *
$2,561
$1,934
$1,693
$2,197
1946
1947
1948
Cash paid out
$4,062
$5,937
$3,652
Net income per return
3,568
2,342
2,117
Excess (approximate) *
$ 494
$3,595
$1,535
The approximate "excess" of disbursements above reported net income totals, for 1942-1948, inclusive, $14,009. As of December 31, 1941, the petitioners had undeposited cash in the amount of $23,250. During the years 1942-1948, inclusive, *286 this amount was disposed of through a deposit in a savings account in the amount of $4,000, and through expenditures of $16,250 for real estate payments and purchases of bonds, leaving a balance of $3,000 at the end of 1948. During the years 1942-1948, the petitioners accumulated gradually out of current receipts $21,651, which when added to the balance of their pre-1942 accumulations, brought their undeposited cash on hand to $24,651. The petitioners accumulated in dated envelopes $200 in 1942; $200 in 1943; $2,295 in 1944; $700 in 1946; $1,000 in 1947; and $2,700 in 1948; a total of $7,095. In addition. during the years 1942-1948, they accumulated $14,556; a total of $21,651. Taking into account pre-1942 cash, expenditures of this fund, and cash accumulations during the years 1942-1948, the petitioners had undeposited cash on hand at the end of each of the years 1942-1948, inclusive, the following amounts: Undeposited
End of Year
Cash Balance
1942
$24,079.42
1943
26,133.84
1944
21,433.26
1945
23,512.68
1946
26,292.10
1947
27,871.52
1948
24,651.00
Petitioners' net worth at the end of 1941 amounted to $37,312.54. Their net worth increased in *287 the amounts shown below during each of the years 1942-1948, inclusive. Their taxable net income, based on increase in net worth plus nondeductible expenditures, for each of the years 1942-1948, inclusive, is set forth below, together with their understated and unreported income for each of the taxable years. Their unreported taxable income for the seven years amounted to at least $23,808.73. Increase
Taxable
Unreported
Year
Net Worth
Net Worth
Net Income
Net Income
1942
$39,898.03
$2,585.49
$4,885.49
$2,756.66
1943
42,800.75
2,902.72
5,271.27
3,115.55
1944
46,903.01
4,102.26
6,470.38
4,223.64
1945
48,478.80
1,575.79
3,985.61
2,447.02
1946
52,068.62
3,589.82
5,889.82
2,321.52
1947
56,116.13
4,047.51
6,780.00
4,437.09
1948
60,441.06
4,324.93
6,624.93
4,507.25
The petitioners filed false or fraudulent returns for each of the years 1942-1948, inclusive. Part of the deficiency for each year was due to fraud with intent to evade tax. Opinion The petitioners claim that they had undeposited cash at the end of 1941 in the amount of $42,000. They assert that the alleged $42,000 represented the balance of their combined *288 pre-1925 savings and of gifts which both received in 1937. They claim, also, that they saved very little before and during the period 1942-1948, inclusive; that they did not spend all of the alleged $42,000 during the period 1942-1948, inclusive, and that the end of 1948, there remained out of $42,000 a balance of $24,651. They contend that none of $24,651 was out of income for the period 1942-1948. The petitioners contend, upon the above alleged facts, that the respondent erred in omitting from their assets at the beginning of his net worth statements, undeposited savings in the amount of $42,000. They contend, also, that the amounts of undeposited savings which the respondent computed as of the end of each of the years 1942-1948, in his net worth statements, are incorrect. The petitioners contend, further, that because of these alleged errors in the respondent's net worth statements, his determinations of increases in net worth, taxable net income, and unreported net income are not correct, and should be set aside. Petitioners contend that they did not file false or fraudulent returns for any of the years in question. They contend, also, that the determinations of deficiencies *289 in tax for the years 1942-1946, inclusive, are barred. In support of the claim that there was undeposited cash at the end of 1941, the beginning of respondent's net worth statements, in the amount of $42,000, the following testimony was given: James Miles testified that he brought $10,000 of savings from Panama to the United States in 1925; and that in Jamaica in 1937, his father gave him cash in the amount of $15,000. Annie Miles testified that she brought $12,500 of savings from Panama in 1925; and that her father gave her, in Jamaica, $14,500, in cash in 1937. The petitioners testified that out of this $52,000 of savings and gifts received, which were commingled, $10,000 was spent before the end of 1941, and $42,000 remained. The chief question to be decided is whether the petitioners had undeposited cash on hand at the end of 1941, and, if any, the amount thereof. A related question is whether the respondent was justified in using the increase in net worth and expenditures method of determining petitioners' net income for the years 1942-1948, inclusive. The circumstance which underlies the respondent's determinations is the petitioners' possession in 1949 of a substantial *290 accumulation of undeposited cash. The parties are in agreement in regarding $24,651 thereof as cash on hand at the end of 1948. Part of the accumulation was in dated envelopes, the first year of the dates being 1942. Since the petitioners had no records to explain when and how they came into the possession of the undeposited cash, and since they reported taxes of only $573.22 for the seven years, 1942-1948, and filed no returns for earlier years, the accumulation of cash brought under scrutiny the returns for the years in question. The respondent's agents, in the course of their investigation, ascertained that petitioners' assets increased during the period in question. As to the amounts of their assets, liabilities, and estimated nondeductible cash expenditures, no questions are raised; the parties are now in agreement about the amounts thereof for use in a net worth analysis. But the respondent's agents did not find any sources of income other than the petitioners reported, namely, professional fees and rents. Since the taxpayers' retained no records of their pre-1942 income, and since such informal records as they maintained and retained for 1946, 1947, and 1948 were wholly inadequate *291 and largely lacking with respect to the receipts and expenses of their rental properties, and since there were no records of income available for 1942-1945, the respondent was obliged to resort to some other method to determine income for the period 1942-1948. He resorted to the net worth and expenditures method starting with the end of 1941. We are satisfied that the respondent was justified in resorting to the net worth method. Petitioners do not seriously question his use of that method. Their accountant resorted to the same method in an effort to show that respondent's determinations of the amounts of taxable net income were in error. The respondent has the burden of proving fraud as to all of the years before us, and unless fraud is found with respect to the years 1942-1946, inclusive, the statute of limitations bars the assessment and collection of any tax deficiencies for those years. However, the respondent's burden of proof relates to the penalties only and, as has been pointed out frequently, that burden does not relieve the petitioners of the burden of disproving the correctness of the deficiencies. They must overcome "the presumption of correctness attaching to the Commissioner's *292 finding of the amount of tax due." , affd. . See , certiorari denied ; ; and . The respondent's determinations of increases in net worth are questioned because he did not allow petitioners any amount for savings at the beginning of the net worth period. If this was error, his determinations are in error. It is fundamental that the net worth at the beginning of a net worth statement shall be correct. The petitioners contend that they had $42,000 of undeposited cash at the end of 1941, which gradually decreased to $24,651 as they made payments on real estate, bought bonds, and enlarged their savings account by $4,000 after the end of 1941. But they have nothing except their own statements to support their contention; they have no records, and no one ever saw $42,000 in their possession at the time which is pertinent. Furthermore, the amount, $42,000, is roughly the equivalent of $4,000 deposited in a savings account in *293 1944, $14,000 paid on real estate, and $24,651 cash on hand at the end of 1948. The figure asserted by the petitioners is obviously suggested by the undisputed amount of cash which they handled between the end of 1941 and of 1948. Also, it is apparent that thedeficiencies which the respondent has determined follow from treating, in effect, more than $42,000 as income for the seven years 1942-1948, inclusive. In fact, petitioners not only had $24,651 cash at the end of 1948, but they also handled and spent during the seven years involved $20,250 for savings bonds, real estate payments, and savings account deposit, exclusive of monthly mortgage payments, and current general and living expenses. The problem, therefore, is not merely how to treat $24,651, but how to account for cash on hand during 1942-1948 in excess of $42,000. Petitioners' testimony that each received a gift of cash in a stated amount in 1937 in Jamaica is not refuted. To what extent the testimony is credible is to be determined from the entire record. The testimony about the amount which each saved in Panama and brought to the United States in 1925 stands on a different footing, for although it is entirely credible *294 that each had saved money while working in Panama for 11 years, the testimony about the extent of such savings is vague and there is very little in the testimony to establish petitioners' general expenses, as well as income, from 1925 until 1942. On the other hand, it is established that petitioners spent $13,877.81 before 1942. Our conclusion is that we believe, in part, petitioners' testimony that they had savings at the end of 1941. We think a reasonable inference is that a large part, if not all, of their pre-1925 savings was exhausted by the end of 1941, or before, and that such savings as they had at the end of 1941 was derived from pre-1942 earnings and gifts. Upon consideration of all of the record and evidence, it is our judgment and conclusion that some of the fund of over $42,000 was derived from receipts of the period 1942-1948. In arriving at this conclusion, consideration has been given to three factors, namely; (1) the gross income from professional fees and from rents and the total deductions reported in petitioners' income tax returns; (2) the testimony of James Miles that during the period 1942-1948 he "replaced" some of his pre-1942 savings with moneys received *295 from patients and rents to make up the inroads made into those savings; and (3) the character of the accumulation of currency in the safedeposit box and of the wrappers containing currency and the kind of marks and writing thereon. 1. The petitioners made no effort, during their attempt to discharge their burden of proof, to substantiate the large amounts of the deductions taken in their returns. Their reported gross income increased from $6,171.59 in 1942, to $11,863.62 in 1948. Their reported gross income from all sources amounted to $61,140.72 for the seven years, and of that sum, $36,469.15 was the reported gross income from rents. On the other hand, deductions also increased from $4,042.76 in 1942 to $9,745.94 in 1948, and totaled $45,042.45 for seven years. The annual total deductions are large. During the trial, counsel for petitioners was advised that the income tax returns in themselves were not proof of 1948, there remained out of $42,000 a balance of $24,651. They contend that none of $24,651 was out of income for the period 1942-1948. The petitioners contend, upon the above alleged facts, that the respondent erred in omitting from their assets at the beginning of his *296 net worth statements, undeposited savings in the amount of $42,000. They contend, also, that the amounts of undeposited savings which the respondent computed as of the end of each of the years 1942-1948, in his net worth statements, are incorrect. The petitioners contend, further, that because of these alleged errors in the respondent's net worth statements, his determinations of increases in net worth, taxable net income, and unreported net income are not correct, and should be set aside. Petitioners contend that they did not file false or fraudulent returns for any of the years in question. They contend, also, that the determinations of deficiencies in tax for the years 1942-1946, inclusive, are barred. In support of the claim that there was undeposited cash at the end of 1941, the beginning of respondent's net worth statements, in the amount of $42,000, the following testimony was given: James Miles testified that he brought $10,000 of savings from Panama to the United States in 1925; and that in Jamaica in 1937, his father gave him cash in the amount of $15,000. Annie Miles testified that she brought $12,500 of savings from Panama in 1925; and that her father gave her, in Jamaica, *297 $14,500, in cash in 1937. The petitioners testified that out of this $52,000 of savings and gifts received, which were commingled, $10,000 was spent before the end of 1941, and $42,000 remained. The chief question to be decided is whether the petitioners had undeposited cash on hand at the end of 1941, and, if any, the amount thereof. A related question is whether the respondent was justified in using the increase in net worth and expenditures method of determining petitioners' net income for the years 1942-1948, inclusive. The circumstance which underlies the respondent's determinations is the petitioners' possession in 1949 of a substantial accumulation of undeposited cash. The parties are in agreement in regarding $24,651 thereof as cash on hand at the end of 1948. Part of the accumulation was in dated envelopes, the first year of the dates being 1942. Since the petitioners had no records to explain when and how they came into the possession of the undeposited cash, and since they reported taxes of only $573.22 for the seven years, 1942-1948, and filed no returns for earlier years, the accumulation of cash brought under scrutiny the returns for the years in question. The respondent's *298 agents, in the course of their investigation, ascertained that petitioners' assets increased during the period in question. As to the amounts of their assets, liabilities, and estimated nondeductible cash expenditures, no questions are raised; the parties are now in agreement about the amounts thereof for use in a net worth analysis. But the respondent's agents did not find any sources of income other than the petitioners reported, namely, professional fees and rents. Since the taxpayers' retained no records of their pre-1942 income, and since such informal records as they maintained and retained for 1946, 1947, and 1948 were wholly inadequate and largely lacking with respect to the receipts and expenses of their rental properties, and since there were no records of income available for 1942-1945, the respondent was obliged to resort to some other method to determine income for the period 1942-1948. He resorted to the net worth and expenditures method starting with the end of 1941. We are satisfied that the respondent was justified in resorting to the net worth method. Petitioners do not seriously question his use of that method. Their accountant resorted to the same method in an *299 effort to show that respondent's determinations of the amounts of taxable net income were in error. The respondent has the burden of proving fraud as to all of the years before us, and unless fraud is found with respect to the years 1942-1946, inclusive, the statute of limitations bars the assessment and collection of any tax deficiencies for those years. However, the respondent's burden of proof relates to the penalties only and, as has been pointed out frequently, that burden does not relieve the petitioners of the burden of disproving the correctness of the deficiencies. They must overcome "the presumption of correctness attaching to the Commissioner's finding of the amount of tax due." , affd. . See , certiorari denied ; ; and . The respondent's determinations of increases in net worth are questioned because he did not allow petitioners any amount for savings at the beginning of the net worth period. If this was error, *300 his determinations are in error. It is fundamental that the net worth at the beginning of a net worth statement shall be correct. The petitioners contend that they had $42,000 of undeposited cash at the end of 1941, which gradually decreased to $24,651 as they made payments on real estate, bought bonds, and enlarged their savings account by $4,000 after the end of 1941. But they have nothing except their own statements to support their contention; they have no records, and no one ever saw $42,000 in their possession at the time which is pertinent. Furthermore, the amount, $42,000, is roughly the equivalent of $4,000 deposited in a savings account in 1944, $14,000 paid on real estate, and $24,651 cash on hand at the end of 1948. The figure asserted by the petitioners is obviously suggested by the undisputed amount of cash which they handled between the end of 1941 and of 1948. Also, it is apparent that thedeficiencies which the respondent has determined follow from treating, in effect, more than $42,000 as income for the seven years 1942-1948, inclusive. In fact, petitioners not only had $24,651 cash at the end of 1948, but they also handled and spent during the seven years involved *301 $20,250 for savings bonds, real estate payments, and savings account deposit, exclusive of monthly mortgage payments, and current general and living expenses. The problem, therefore, is not merely how to treat $24,651, but how to account for cash on hand during 1942-1948 in excess of $42,000. Petitioners' testimony that each received a gift of cash in a stated amount in 1937 in Jamaica is not refuted. To what extent the testimony is credible is to be determined from the entire record. The testimony about the amount which each saved in Panama and brought to the United States in 1925 stands on a different footing, for although it is entirely credible that each had saved money while working in Panama for 11 years, the testimony about the extent of such savings is vague and there is very little in the testimony to establish petitioners' general expenses, as well as income, from 1925 until 1942. On the other hand, it is established that petitioners spent $13,877.81 before 1942. Our conclusion is that we believe, in part, petitioners' testimony that they had savings at the end of 1941. We think a reasonable inference is that a large part, if not all, of their pre-1925 savings was exhausted *302 by the end of 1941, or before, and that such savings as they had at the end of 1941 was derived from pre-1942 earnings and gifts. Upon consideration of all of the record and evidence, it is our judgment and conclusion that some of the fund of over $42,000 was derived from receipts of the period 1942-1948. In arriving at this conclusion, consideration has been given to three factors, namely; (1) the gross income from professional fees and from rents and the total deductions reported in petitioners' income tax returns; (2) the testimony of James Miles that during the period 1942-1948 he "replaced" some of his pre-1942 savings with moneys received from patients and rents to make up the inroads made into those savings; and (3) the character of the accumulation of currency in the safedeposit box and of the wrappers containing currency and the kind of marks and writing thereon. 1. The petitioners made no effort, during their attempt to discharge their burden of proof, to substantiate the large amounts of the deductions taken in their returns. Their reported gross income increased from $6,171.59 in 1942, to $11,863.62 in 1948. Their reported gross income from all sources amounted to $61,140.72 *303 for the seven years, and of that sum, $36,469.15 was the reported gross income from rents. On the other hand, deductions also increased from $4,042.76 in 1942 to $9,745.94 in 1948, and totaled $45,042.45 for seven years. The annual total deductions are large. During the trial, counsel for petitioners was advised that the income tax returns in themselves were not proof of gross and net income and needed explanation. Nevertheless, the deductions were neither substantiated nor explained. Since there is no direct proof of income in excess of what petitioners reported, an inference can be made that substantially all of their gross income was reported, and this is in petitioners' favor. But it does not follow that petitioners could not have derived part, at least, of the $24,651 from the gross receipts of the seven years as reported. Large amounts of unsubstantiated deductions give rise to an adverse inference that excessive deductions may have been taken which brought about the low net income reported. We cannot give full weight to petitioners' argument that their reported gross income during the seven years was so low that no part of their $24,651, or of their large expenditures during *304 the seven year period, could possibly have come from their current income. 2. James testified that some of the currency which he placed in envelopes, which he kept at first in a desk drawer in his office in Washington, came from his patients and from rents. He testified that he replaced the sum of $4,000 which was deposited in the joint savings account in 1944 with sums accumulated from his practice and from rents. Some of his testimony is as follows: "Q. You kept this money, you said, in your desk at the office? A. Yes. Q. Now, Doctor, will you tell us just how that was done and what arrangements you had to keep the money there? A. Well, first, to begin with, we didn't want to get the money we brought in the country mixed up with the money we earned here, so we tried, as far as we could, to keep it apart. So I kept the money in the drawer of the desk, with the expectation of investing it in real estate. When I took that $4,000 out of the money we brought here and put it in the savings account, I replaced that by what we collected from rent from time to time and from my practice." (Tr. p. 103, 104). * * *
Elsewhere in the record is similar testimony. (Tr. pages 113, *305 114, 115, 510, 511, 513). 3. The accumulation of cash in petitioners' lock box in 1949 consisted of currency in small denominations. Altogether, there were 4,074 pieces of currency of which 1,100 were one-dollar bills, 1,205 were five-dollar bills, 1,210 were ten-dollar bills, and 250 were twenty-dollar bills. The petitioners failed to explain satisfactorily how or why they accumulated such a great number of pieces of currency in small denominations. The existence in 1949 of so large an accumulation of small denominations of currency gives rise to an inference which is unfavorable to petitioners' stories that the accumulation represented in large part gifts brought from Jamaica, and the balance of pre-1925 savings brought from Panama. It gives rise to an inference that the currency came from current receipts of money which were gradually accumulated. Envelopes bearing postmarked dates of the years 1942, 1943, 1944, 1946, 1947, and 1948, contained currency in small denominations totaling $7,095. There were 4 undated envelopes on which James noted series of figures indicating gradual accumulations of cash. He testified that it was his practice to note the total of the contents on *306 an envelope, and to cross out an old total and write a new total when he put additional money in the envelope. These 4 undated envelopes contained, in 1949, $985, $1,000, $1,000, and $1,000, or a total of $3,985. An inference can be made from testimony of James and from the dates on the dated envelopes that $11,680 was accumulated by petitioners during the period 1942-1949, inclusive. Also, the writings on other envelopes were made with different implements, crayons in different colors, pencil, and pen. The inference is that the writing was done at various and different times rather than at one time, such as just before putting the entire accumulation in the safe-deposit box as petitioners testified. We have observed inconsistencies in the testimony of each petitioner. We notice, also, that petitioners' net worth statement, which, of course, is as favorable to their contentions as possible, produces understatements, i.e., unreported income for 1943 and 1947 in excess of $2,000 for each year. Giving the most favorable consideration to the evidence, we have found that petitioners had undeposited savings at the end of 1941 in the amount of $23,250. Cf. . *307 Petitioners' contentions that their pre-1942 savings amounted to $42,000 and that none of the $24,651 on hand at the end of 1948 came from post-1942 earnings are rejected in part for failure of proof. Testimony on the matter is not entirely credible. We have made findings about the amounts of undeposited cash on hand at the end of each of the taxable years. The amounts found are necessarily approximations but they represent the application of certain factors. We deem it proper to recognize that the fund of pre-1942 cash savings was expended from time to time and accept petitioners' testimony to that effect. It was, therefore, a diminishing fund. On the other hand, the evidence relating to envelopes containing cash has been taken into account and we have included in the second fund, namely, cash accumulated during the years 1942-1948, at the end of 1942, 1943, 1944, 1946, 1947, and 1948, the amounts contained in envelopes bearing postmarked dates. We find that a second fund of $21,651 was accumulated from 1942 through 1948 in increasing amounts. It has been necessary to make allocation of this amount over the 7 years as best we can. Cf. *308 In so doing, we have taken into account the fact that petitioners' gross income, as reported, increased gradually in each of the taxable years. Accordingly, the total amounts found for undeposited cash on hand at the end of each of the taxable years, for purposes of modification of respondent's revised net worth statement, represent the total at the end of each year of the balance on hand of the pre-1942 fund of savings, and our estimate of the post-1942 annual accumulation of cash savings. These totals are indicated by the evidence and represent as careful allocation as can be made. We are mindful of the admonition that great care and restraint should be exercised in applying the net worth method of computing taxable income. . We have made findings on petitioners' net worth at the end of each year and increases in net worth, and therefrom have found the amounts of taxable net income and unreported net income. It is concluded and found that petitioners' net income for each year was understated in amounts ranging from about $2,447 to $4,507 as set forth in the Findings of Fact, totalling at least $23,808.73. The remaining issue *309 is whether a false or fraudulent return was filed for any year, and whether any part of a deficiency is due to fraud with intent to evade tax. Upon the whole record, it is concluded that the respondent has discharged his burden of proof under this issue; that deficiencies for the years 1942-1946, inclusive, are not barred, and that the penalties of 50 per cent of the deficiencies properly have been added under section 293(b) of the 1939 Code. Such finding we think is supported by clear and convincing evidence. The return of petitioners for each of the taxable years reported taxable net income in an amount less than current cash expenditures for nondeductible mortgage payments, savings bonds, and nondeductible personal and living expenses estimated at $2,300 per year, at least. That is the situation in its minimal aspect. After giving the most weight possible to the contention that all of the large expenditures during the seven years involved for bonds, down payments on real estate, and increase in a savings account in a bank came from pre-1942 savings, the record supports the finding that the petitioners accumulated cash after 1942 in amounts greatly in excess of the net income which *310 was reported. Repeated and continuous understatements of net income in returns strongly evidence a fraudulent intent to evade taxes. , affirming ; . James Miles, a doctor of medicine, and his wife, Annie, both intelligent persons, failed to maintain and retain adequate records from which their income could be determined. They chose to keep concealed and hidden accumulations of cash without any records from which it could be ascertained that the accumulation did not represent unreported income and did represent either savings which were not income, or gifts. Their testimony about the sources of their undeposited cash was vague and at times contradictory. Petitioners could not verify, explain, or justify the large and increasing amounts of deductions taken in their returns. Their income was substantially understated for each taxable year. Their concealment of a large amount of cash without explanatory records is indicative of fraudulent intent to evade taxes. . Full consideration of all of the record, of the demeanor *311 of the petitioners as witnesses, and of all of the circumstances leads to the conclusion that part, at least, of each deficiency was due to fraud with intent to evade tax, and we have so found. Cf. ; ; Kite, et al., v. Commissioner, - Fed. (2d) - (C.A. 5, February 4, 1955). Decision will be entered under Rule 50. Footnotes
*. Petitioners did not introduce in evidence a breakdown of mortgage payments into interest payments and principal payments.↩